McBRIDE, Judge.
Plaintiff-appellant, an insurance broker, brings this suit against the defendants, who are members of a commercial co-partnership, for the sum of $360, representing the premium on a policy of marine insurance, which plaintiff secured for defendants. The petition alleges that plaintiff is personally responsible for the premium under his arrangement with the underwriters. He also claims that he incurred certain expenses and attorney’s fees in connection with the matter; however, plaintiff has waived his claim therefor, and the only amount involved in the suit is the $360 premium.
The testimony consists of one hundred twenty-seven typewritten pages, and in several instances there is sharp conflict between plaintiff’s evidence and that adduced by the defendants as to what was said and understood in connection with the issuance of the policy of marine insurance. In the main, it is not disputed that the defendants were the owners of the vessel “Earline II,” which they had agreed to sell to a purchaser in Ciudad del Carmen, Mexico, one of the conditions of the sale being that defendants would deliver the vessel to the purchaser at the Mexican port. Defendants desired to have the vessel covered against marine *754 risks on the trip from the Mississippi River across the Gulf to the purchaser. They contacted their own insurance agent for the type of insurance desired, and finding that their agent did not handle that type of insurance, a Mr. Fadrique, the representative of the purchaser of the vessel, was instrumental in having a contact made between the defendant, Poillion, and plaintiff Bryan, with reference to having the boat insured. Bryan in turn got in touch with the Southern Marine and Aviation Underwriters, Inc., through a Mr. Mead, who agreed to endeavor to get the insurance from Lloyd’s of London. These negotiations, by telephone, took place on March 24, 1948. Poil-lion first spoke to Bryan some time before noon on that date, and Bryan informed Poil-lion that he believed that he could secure the desired coverage on the vessel. After speaking to Mead, Bryan called Poillion back and stated that he could secure insurance in the full amount, $9000, at a premuim of not more than 4%. The focal point in the case is whether Bryan agreed to deliver a written binder to defendants’ office by 10 :00 the next morning. Bryan’s testimony is that there was no specific understanding as to a written binder; he denies that any sort of binder was to b¿ given to the defendants by 10:00 the next morning. It is not disputed that at the time of the telephone conversations between Bryan and Poillion it was Poillion’s intention to depart as soon as possible on the vessel bound for Mexico. Poillion’s testimony is that it was understood that Bryan was to deliver a written binder to defendants’ office before 10:00 A. M., March 25, 1948, which was to be received by Turan, Poillion’s partner, who would pay Bryan one-half of the premium; the balance of the premium to be paid upon delivery of the policy itself. Poillion states that Bryan agreed to this arrangement, while, on the other hand, Bryan denies this, but he does admit that he was to collect 50% of the premium the following day.
At any rate, on March 24, 1948, at 6:30 P. M., Poillion, accompanied by a crew' member, sailed the Earline II from Venice, Plaquemines Parish, located on the Mississippi River, and arrived • in the Mexican port on the morning of March 28, 1948. Poillion returned to New Orleans by air on March 30, 1948 at 8:00 P. M.
Before entering the Gulf of Mexico, Poillion communicated by telephone with his partner, Turan, and informed Turan of the arrangement whereby Bryan was to deliver the binder and collect 50% of the premium.
After the second telephonic conversation with Poillion, Bryan left New Orleans for a weekend vacation, and the only other' negotiation which took place in connection with the issuance of the insurance was a conversation between Mead, of the Underwriters, and Turan, Poillion’s partner, on the afternoon of March 25, 1948. Mead, who was unknown to Turan, called him by telephone and informed him that the vessel was insured. Mead is hazy in his recollection as to exactly what was said in his conversation with Turan, but Turan is positive that while he expressed satisfaction that the insurance would be issued, he inquired óf Mead as to the delivery of a binder and was informed by Mead that he was only passing along the information that the boat was insured and that Bryan would “take care of the rest.”
Mead’s conversation with Turan was prompted by the receipt of a cablegram from Lambert Bros. Ltd. in London stating that Lloyd’s had accepted the risk. Mead states that the cablegram was received by him about noon o.n March 25, 1948, and that shortly thereafter his conversation with Turan ensued.
On March 25, 1948 Southern Marine and Aviation Underwriters, Inc. issued a document labelled a “Cover Note” which stated that upon the instructions of Poillion it had effected the insurance with Lloyd’s of London. Strangely, however, instead of delivering this cover note to the defendants’ office, Mead saw fit to mail it to Bryan, who had already left New Orleans on the weekend vacation. Bryan did not send the cover note to the defendants until his return to New Orleans on the following Monday morning, and we are convinced that the *755 cover note, which was also accompanied by Bryan’s bill, was not received by the defendants until sometime after Poillion had returned to New Orleans from his trip to Mexico.
The defense advanced is that by not having the binder in the defendants’ office at 10:00 on the morning of March 25, 1948, the contract between Poillion and Bryan was not fulfilled by the latter, and that defendants are not liable for the premium on the insurance, notwithstanding that a policy was actually issued later.
The trial judge believed the defense witnesses and found, as a matter of fact, that there was a specific agreement as to the delivery of a written binder on March 25, 1948 before 10:00 A. M., and that Bryan failed in his undertaking in not having the binder in defendants’ office by the specified time. Although Bryan disavows any such arrangement, it is clear from his own testimony that there was some talk of a binder being issued and that Turan was to pay Bryan 50% of the premium upon receipt of the binder. The reason why Poillion insisted upon a binder being delivered was his failure to secure the insurance from his own agent and his skepticism as to whether he could secure the necessary insurance from any source. The import of his testimony is that the defendant partnership wanted to make sure that the vessel was covered on its trip and to have in its possession written evidence of that fact.
Plaintiff's counsel devotes a considerable portion of his argument to the contention that in the insurance business verbal binders are customary and that the notice which Mead gave to Turan was sufficient as to the effectuation of the insurance, and that defendants are liable for the 4% premium. However, counsel overlooks the fact that the binder, even if a verbal binder can be said to have been contemplated, was not made or given until some time past the 10:00 A. M. deadline agreed upon by the parties in the negotiations for the insurance.
Some of plaintiffs testimony is to the effect that it is the custom in the insurance field for a broker or agent to verbally bind the insurer until the formal policy is issued, but the record convinces us that demands for written binders are not at all unusual.
It is interesting to note that on cross-examination Mead was asked the question, “Just what is a binder?” His answer was, “In my definition, the binder is a written agreement showing that insurance has been effected.”
Stentz, the assistant-manager for Southern Marine and Aviation Underwriters Inc., on cross-examination, gave this bit of testimony:
“Q. But you do write written binders? A. Yes.”1
“Q. And a person has the right to specify the time for receiving the binder, and ask for it to be in writing; isn’t that correct? A. Yes.”
Our Supreme Court in the case of Brown v. North River Insurance Company, 144 La. 504, 80 So. 674, 678, defines a binder as:
“ ‘A document given to the insured, which binds the company to pay insurance, should a fire occur while the policy is being prepared.’ ”
After considering the record as a whole, our view coincides with that entertained by the lower court. Even though the cover note and the policy from Lloyd’s show that the vessel was insured on its voyage to Mexico, we can find no liability in defendants for the amount of the premium for the reason that the timely delivery of a written binder was a condition precedent and on which the contract depended, as defendants only agreed to accept the insurance in the event that the binder was delivered by Bryan before the time fixed.
Therefore, the judgment appealed from is affirmed.
Affirmed.
REGAN, J., absent takes no part.